IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARIANNE DUFFY, by her parents and legal guardians, Sean and Elise Duffy, <br><br> Plaintiff, <br><br> v. <br><br> VINCENT MECONI, Secretary, Delaware Department of Health & Social Services, in his official capacity, <br><br> MARIANNE SMITH, Director, Division of Developmental Disabilities Services, in her official capacity, and <br><br> ELAINE ARCHANGELO, Director, Division of Social Services, in her official capacity, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  C.A. No. 05-127 (GMS) |

MaryBeth Musumeci, Esquire, and Dan Atkins, Esquire of COMMUNITY LEGAL AID SOCIETY, INC., Wilmington, Delaware, and Jane Perkins, Esquire, and Sarah Somers, Esquire of NATIONAL HEALTH LAW PROGRAM, Chapel Hill, North Carolina. Attorneys for Plaintiff.

Noel C. Burnham, Esquire, and Richard M. Donaldson, Esquire of MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP, Wilmington, Delaware, A. Ann Woolfolk, Esquire, DEPUTY ATTORNEY GENERAL FOR THE STATE OF DELAWARE, Wilmington, Delaware, and Patrick T. Ryan, Esquire, and Jessica C. Goebeler, Esquire of MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP, Philadelphia, Pennsylvania. Attorneys for Defendants.

**OPINION**

October 28, 2005
Wilmington, Delaware

SLEET, District Judge

FILED
OCT 28 2005
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## I. INTRODUCTION

The above-captioned action is one for declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202 (1994), and Fed. R. Civ. P. 57 and 65, arising from the Defendants' alleged violations of 42 U.S.C. § 1983 (2003). (D.I. 1 ¶ 5.) Presently before the court is the Defendants' motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief can be granted. (D.I. 11.) For the following reasons, the court will deny the motion.

## II. JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4) (1993).

## III. STANDARD OF REVIEW

"When considering a Rule 12(b)(6) motion, [the court] accept[s] as true all the allegations set forth in the complaint, and . . . draws all reasonable inferences in the plaintiff's favor. *See Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir. 1991). Dismissal of a plaintiff's claim under Rule 12(b)(6) occurs only if the plaintiff 'can prove no set of facts in support of [her] claim which would entitle [her] to relief.' *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957)." *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 604 (3d Cir. 1998).

## IV. BACKGROUND

The plaintiff, Marianne Duffy, is a 31-year-old resident of North Carolina. (D.I. 1 ¶ 2.) Duffy, a Medicaid beneficiary, lives in an intermediate care facility for mental retardation ("ICF/MR") in that state because she suffers from "developmental disabilities including blindness, seizures, autism, and mental retardation." (Id. ¶¶ 1-2.) In 2001, Duffy's parents relocated from

1

North Carolina to Delaware. (Id. ¶ 2.) Because they are unable to care for their daughter on their own for any significant period of time, "the Duffys applied to the Defendants to obtain residential placement and services through Delaware's Medicaid program." (Id. ¶¶ 2, 21.) However, Defendant Marianne Smith, Director of the Division of Developmental Disabilities Services ("DDDS"), "determined that [Duffy] was not a [Delaware] resident and her residential placement needs were not 'urgent' according to the state registry system and therefore determined that [Duffy] would not be provided with community residential services." (Id. ¶ 25.) Hence, Duffy filed the present action, in which she alleges that the Defendants' refusal to provide her with residential placement and services violates the Privileges and Immunities Clause of Article IV of the Constitution (Count I), the Privileges and Immunities Clause of the Fourteenth Amendment (Count II), and the Equal Protection Clause of the Fourteenth Amendment (Count III). (Id. ¶¶ 28-33.)

## V. DISCUSSION

Medicaid "authorizes Federal grants to States for medical assistance to low-income persons who are age 65 or over, blind, disabled, or members of families with dependent children or qualified pregnant women or children." 42 C.F.R. § 430.0 (2004). "Within broad Federal rules, each State decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures." *Id.* One such federal rule is that a participating state "must provide Medicaid to eligible residents of the State." § 435.403(a). Consequently, a person's entitlement to benefits from a particular state often turns on whether she is a resident of that state, which is determined by where she fits within a detailed scheme of regulations. In Duffy's case, because she is institutionalized and became incapable of indicating her intent before her twenty-first birthday, her state of residence is the same as her parents' state of residence at the time she was placed in an

institution, i.e., North Carolina. § 435.403(i)(2)(ii); *see also* 16-5000-5100 Del. Code Regs. § 14110.7(a). Thus, in spite of the fact that her parents currently reside in Delaware, she remains a citizen of North Carolina. As such, she is ineligible for Medicaid benefits in Delaware. Moreover, if Duffy were to move to an institution in Delaware anyway (which she allegedly cannot afford to do), North Carolina would no longer be required to pay Medicaid benefits either. In essence, then, Duffy alleges that Delaware's refusal to pay her Medicaid benefits until she first becomes a resident acts as a monetary obstacle that unconstitutionally infringes upon her right to travel.

> The right to travel has deep roots in our nation's jurisprudence:
>
> This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement. That proposition was early stated by Chief Justice Taney in the *Passenger Cases*, 7 How. 283, 492 (1849).

*Shapiro v. Thompson*, 394 U.S. 618, 629-30 (1969); *see also Saenz v. Roe*, 526 U.S. 489, 498 (1999) ("The word 'travel' is not found in the text of the Constitution. Yet the 'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence. *United States v. Guest*, 383 U.S. 745, 757, 16 L. Ed. 2d 239, 86 S. Ct. 1170 (1966)."). And, although the words "right to travel" appear nowhere in the Constitution, it is a fundamental right that is implicated by many clauses therein, including the Privileges and Immunities Clause of Article IV, *Shapiro*, 394 U.S. at 630 n.8, the Privileges and Immunities Clause of the Fourteenth Amendment, *id.*, and the Equal Protection Clause of the Fourteenth Amendment, *see generally id.* In *Shapiro*, the leading case in this area, the Court was confronted with an equal protection challenge to a one-year waiting period on the receipt

3

of welfare benefits by new state residents. Applying a strict scrutiny test, the waiting period was struck down as failing to promote permissible and compelling government interests. *See id.* at 627-38. More recently, Chief Judge Posner, writing for the Seventh Circuit Court of Appeals in *Bethesda Lutheran Homes and Servs. v. Leean*, 122 F.3d 443 (7th Cir. 1997) (Posner, C.J.), relied primarily on the reasoning in *Shapiro* to strike down the same federal Medicaid regulatory scheme at issue here.

*Bethesda Lutheran* involved two sets of plaintiffs: (1) those plaintiffs living outside Wisconsin who desired to move to an ICF/MR facility in that state, known as Bethesda Lutheran; and (2) those plaintiffs already living at Bethesda Lutheran who were not actually residents of Wisconsin. *Bethesda Lutheran*, 122 F.3d at 444. State law forbade members of the first set of plaintiffs from moving to an in-state ICF/MR facility unless they first received a recommendation from the social services agency in the *Wisconsin* county in which they were currently residing. However, by virtue of the fact that they were nonresidents, none of them resided in *any* Wisconsin county. *Id.* at 445. "The upshot [was] that to be admitted to [Bethesda Lutheran] the prospective resident [needed to] first establish his residence in a Wisconsin county." *Id.* Although, as the court recognized, "[s]tates do not violate the Constitution by giving preference to residents seeking admission to state universities and other facilities owned by the state or its subdivisions," the state laws at issue in *Bethesda Lutheran* ran afoul of the plaintiffs' rights to travel because the laws forbade non-Wisconsinites from being admitted to private facilities as well. *Id.* Moreover, although there were back-door ways of getting around this obstacle to entry (which involved "flouting the law" while state officials looked the other way), Chief Judge Posner explained that such obstacles need not be insurmountable in order to be unconstitutional. *Id.* at 446. Rather, if a state erects any

such obstacle, "it has to be justified, if it is to pass constitutional muster, by reference to some legitimate interest of the state." *Id.* Because the state could offer no plausible justification, the laws were declared unconstitutional. *Id.* at 447.

The plaintiffs comprising the second set were already residing at Bethesda Lutheran, but they were technically out-of-state residents because they had become incapable of indicating their respective intentions prior to turning twenty one. Thus, pursuant to 42 C.F.R. § 435.403(i)(2)(ii), they assumed their parents' states of residence (all of which happened to be Illinois) upon their admissions to the facility. *Bethesda Lutheran*, 122 F.3d at 447. This placed the plaintiffs in a difficult spot. As nonresidents of the state in which they were *actually* living, Medicaid did not require Wisconsin to provide them with benefits. And, as persons residing at an ICF/MR facility outside of the state in which they *did* qualify for Medicaid, Illinois was not required to provide them with benefits either. *Id.* at 447-48. It was the plaintiffs' position that "the Medicaid regulations prevent[ed] them from establishing that . . . they [were] indeed residents of Wisconsin." *Id.* at 448. The court largely agreed:

> The Medicaid regulations do not forbid anyone to change his state of residence. But neither did the welfare provisions struck down in *Shapiro v. Thompson*. All that either set of provisions does or did is impose a severe monetary penalty on indigents who move from one state to another.

*Id.* Thus, because "the power of a state to confine its public services to residents does not entitle the state to establish arbitrary barriers to a nonresident's becoming a resident," *id.*, the defendants had the burden of demonstrating that the barrier could be permissibly justified. The only substantial argument they put forth – that the regulation was necessary to discourage states from providing the bare minimum care in order to encourage its residents to move to states with better care – had

5

already been deemed an impermissible purpose by the Supreme Court in *Shapiro*. *Bethesda Lutheran*, 122 F.3d at 449 (citing *Shapiro*, 394 U.S. at 629-33). As a result, the federal Medicaid provisions at issue were struck down as unconstitutional. *Bethesda Lutheran*, 122 F.3d at 450.

The Defendants in this case argue that both sets of *Bethesda Lutheran* plaintiffs are distinguishable from Duffy. Regarding the first set, the Wisconsin laws at issue blocked nonresidents from being admitted to *any* in-state ICF/MR facility, private or public, whereas, in this case, there appears to be no legal obstacle to Duffy being admitted to a private ICF/MR facility in Delaware. With that distinction, the court agrees. However, the court is not prepared to agree, at least preliminarily, with the Defendants' distinction regarding the second set. They assert that, unlike the nonresident plaintiffs already residing at Bethesda Lutheran, Duffy can become a resident by being placed in an in-state ICF/MR facility (albeit without the support of Medicaid) by virtue of the fact that her parents currently live in Delaware. It is not, however, immediately apparent to the court that the Defendants are correct in their assertion. According to the Medicaid regulations, Duffy's state of residence is presently controlled by the following:

> For any institutionalized individual who became incapable of indicating intent before age 21, the State of residence is . . . [t]he parent's or legal guardian's State of residence at the time of placement.

42 C.F.R. § 435.403(i)(2)(ii). Furthermore, Delaware's adherence to that regulation is evidenced by its own Medicaid regulations:

> For any institutionalized individual who became incapable of indicating intent before age 21, the State of residence is: the parent's or legal guardian's State of residence at the time of placement or if a legal guardian is appointed and parental rights are terminated, the State of residence of the guardian is used.

16-5000-5100 Del. Code Regs. § 14110.7(a). If Duffy were to move to a facility in this state,

however, the Defendants contend that her state of residence would be controlled by a separate Medicaid regulation:

> For any institutionalized individual who became incapable of indicating intent before age 21, the State of residence is . . . [t]he current State of residence of the parent or legal guardian who files the application if the individual is institutionalized in that State.

§ 435.403(i)(2)(iii). The problem arises because Delaware does not have a similar provision; its regulations only use the "at the time of placement" language of § 435.403(i)(2)(ii). *See* 16-5000-5100 Del. Code Regs. § 14110.7(a). Therefore, on their face, the state regulations appear to trap Duffy in North Carolina.

Even if Duffy could become a resident in the manner prescribed by the Defendants, it is unclear whether a regulatory scheme that forces a prospective resident to go through the extra step of paying for private placement before becoming eligible for Medicaid is constitutional anyway. The court also queries why the parties have failed to address the effect, if any, of one of Medicaid's "specific prohibitions," which states:

> The agency may not deny Medicaid eligibility to an individual in an institution, who satisfies the residency rules set forth in this section, on the grounds that the individual did not establish residence in the State before entering the institution.

42 C.F.R. § 435.403(j)(2). *See also* 16-5000-5100 Del. Code Regs. § 14110.8.1 ("A State cannot deny Medicaid eligibility . . . to an institutionalized individual because the individual did not establish residence in the community prior to admission to an institution."). Additionally, Duffy has not elucidated the nature of the expenses, if any, Medicaid would pay (e.g., travel expenses, placement expenses, other fees charged by the facility, etc.), but for her residency problem. That is to say, assuming *arguendo* that Duffy could legally establish residence by moving to an in-state

ICF/MR facility, it is unclear what expenses she would incur until she qualifies for Medicaid in Delaware. Suffice it to say, without further briefing on these seemingly crucial issues, the court cannot grant the Defendants' motion to dismiss.

In an attempt to further narrow the issues, the court will also address three other matters raised in the briefs. The first such issue is the Defendants' argument that Count I, which alleges a violation of Duffy's right to travel insofar as it is protected by the Privileges and Immunities Clause of Article IV, is insufficient because that clause only protects "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State." (D.I. 11, Attach. 1 at 6-7 (quoting *Saenz*, 526 U.S. at 500).) According to the Defendants, the other two components of the right to travel ("the right of a citizen of one State to enter and to leave another State," and "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State," *Saenz*, 526 U.S. at 500) are not protected by Article IV. Thus, the argument goes, because Duffy does not seek to be "temporarily present" in Delaware, Count I should be dismissed. While it is true that the *Saenz* Court recognized that Article IV explicitly protects the so-called "second component of the right to travel," 526 U.S. at 501, the Court went on to cite approvingly a quote from a very old case out of Pennsylvania, in which it was said that "'fundamental' rights protected by the privileges and immunities clause include 'the right of a citizen of one state to pass through, *or to reside in any other state*.'" 526 U.S. at 501 n.14 (citing *Corfield v. Coryell*, 4 Wash. C. C. 371, 6 F. Cas. 546 (CCED Pa. 1823)) (emphasis added). Therefore, the court disagrees with the Defendants' position and holds that the Privileges and Immunities Clause of Article IV protects all three components of the right to travel.

The next issue is the Defendants' argument that Delaware's obligations under the Equal

8

Protection Clause of the Fourteenth Amendment do not extend to Duffy because she is physically outside the state's jurisdiction. While it is true that the Fourteenth Amendment forbids a state from denying "to any person within its jurisdiction the equal protection of the laws," U.S. Const., amend. XIV, § 1, the court is not persuaded that the phrase "within its jurisdiction" should be construed in such a strictly literal manner. Taken to its extreme, the Defendants' logic would essentially permit Delaware to erect a wall at its border to keep out everyone not "within its jurisdiction," without running afoul of any outsider's right to travel (at least insofar as it is protected by the Equal Protection Clause). Surely, such an absurd result was not intended by the authors of the Fourteenth Amendment. Indeed, even the Defendants concede that, in cases where a person has minimum contacts, a state must not deny equal protection of its laws to that person (for example, in exercising personal jurisdiction) even if he is not physically within the state's territorial jurisdiction.

Nevertheless, this limitation on the power of the Equal Protection Clause must not be deprived of all meaning. In *Plyler v. Doe*, 457 U.S. 202 (1982), the Supreme Court took a rare opportunity to breath some life into the phrase. *Plyler* involved factually dissimilar issues to the present case, but the Court's explanation of "within its jurisdiction" is helpful:

> Although the congressional debate concerning § 1 of the Fourteenth Amendment was limited, that debate clearly confirms the understanding that the phrase 'within its jurisdiction' was intended in a broad sense to offer the guarantee of equal protection to all within a State's boundaries, *and to all upon whom the State would impose the obligations of its laws*.

457 U.S. at 214 (emphasis added). As to the above-emphasized clause, the Defendants' argue that its scope is limited to the exercise of personal jurisdiction over outsiders having minimum contacts with the state. For this proposition, the Defendants cite *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), one of the Supreme Court's leading personal-jurisdiction cases. Disregarding the fact

that the *Burger King* Court neither commented on the meaning of the phrase "within its jurisdiction," nor discussed the Equal Protection Clause at all, the Court's logic actually undercuts the Defendants' position. In *Burger King*, the Court extensively discussed the nature and quality of contacts a person must have with a forum jurisdiction before it can exercise personal jurisdiction over him, and concluded that portion of the discussion with the following passage:

> Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

471 U.S. at 476 (emphasis in original). Given that statement of a state's jurisdictional power, it seems untenable for the Defendants to argue that Duffy, who is "purposefully directing" her efforts toward Delaware, is not "within its jurisdiction."

Moreover, even if Duffy does not have sufficient minimum contacts with Delaware to establish personal jurisdiction, the Court sees no indication from the *Plyler* Court that its extension of equal protection "to all upon whom the State would impose the obligations of its laws" is limited to those upon whom the state could exercise personal jurisdiction. To the contrary, one of the constitutional standing requirements is that "the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual *or imminent*, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) (citations omitted) (emphasis added). In this case, Duffy alleges an imminent injury – her inability

10

to receive Medicaid upon her arrival in Delaware's jurisdiction due to an allegedly unconstitutional regulatory scheme. Were Duffy required to be physically present in Delaware, or to have minimum contacts, before she could challenge the regulatory scheme, the "imminent injury" component of constitutional standing would be rendered meaningless.

The Defendants' also cite a Ninth Circuit case, *Fisher v. Reiser*, 610 F.2d 629 (9th Cir. 1979), as further support for this argument that Duffy cannot invoke the protections of the Equal Protection Clause. In *Fisher*, the State of Nevada provided disability benefits to employees injured while working in state, regardless of their respective states of residence. 610 F.2d at 631. Nevada subsequently passed a law providing for an increase in disability benefits for residents, but not for nonresidents. *Id.* Nonresident plaintiffs challenged the law under the Equal Protection Clause as a violation of their right to travel. *Id.* However, the court rejected the plaintiffs' argument and held that Nevada's new law did not implicate that right. *Id.* at 633. While it is true that the *Fisher* court discussed the need to maintain consistency "with state jurisdictional limitations based on territorial boundaries and the concept of residence," *id.* at 634, nowhere did it discuss the meaning of the phrase "within its jurisdiction." Furthermore, the court distinguished between former residents and current residents:

> [In prior Supreme Court cases,] the issue involved the obligation and responsibility of the claimant's new state of residence; here the claimants seek to enforce an obligation against the state of former residence. The distinction is critical. Any primary obligation to ascertain a citizen's economic status or condition and to make provision for his or her well being falls upon the state of current residence, not the state where the citizen formerly resided. It is a fact of our federal system that a state is limited both in its competence and its responsibility to exercising its welfare powers for those persons who are its residents, and, perhaps in some cases, those temporarily within its borders. We find no authority for the broad proposition that Nevada must pass prospective legislation with reference to the subsistence or economic well being of persons formerly residing in it but who are now resident

elsewhere, or include former residents in statutes passed to aid current residents. *Id.* at 633-34.

Here, too, there is a critical distinction: Duffy seeks to become a resident of the state in which she applied for benefits, whereas the plaintiffs in *Fisher* did *not* seek to become residents of the state in which they applied for benefits. In other words, Duffy alleges that she would travel if not for the Defendants' refusal to pay benefits, but the plaintiffs in *Fisher* made no such allegation. Therefore, unlike *Fisher*, the right to travel is very much at issue in this case. Thus, the court holds that Duffy is not precluded from claiming a violation of the Equal Protection Clause merely because she is in North Carolina.

Finally, to the extent the Defendants argue that its refusal to provide benefits to Duffy is a permissible, "bona fide" residency requirement, the court believes the issue is moot because Duffy clarifies in her briefs that she does not challenge Delaware's right to limit Medicaid to actual residents.

## VI. CONCLUSION

For the aforementioned reasons, the court will deny the Defendants' motion to dismiss.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARIANNE DUFFY, by her parents and legal guardians, Sean and Elise Duffy,<br><br>Plaintiff,<br><br>v.<br><br>VINCENT MECONI, Secretary, Delaware Department of Health & Social Services, in his official capacity,<br><br>MARIANNE SMITH, Director, Division of Developmental Disabilities Services, in her official capacity, and<br><br>ELAINE ARCHANGELO, Director, Division of Social Services, in her official capacity,<br><br>Defendants. | C.A. No. 05-127 (GMS) |

## **ORDER**

IT IS HEREBY ORDERED THAT:

The Defendants' motion to dismiss (D.I. 11) be DENIED.

Dated: October 28, 2005

UNITED STATES DISTRICT JUDGE

FILED
OCT 2 8 2005
U.S. DISTRICT COURT
DISTRICT OF DELAWARE