# EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARIANNE DUFFY, by her parents and legal guardians, SEAN and ELISE DUFFY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) No. 05-CV-127-GMS |
| VINCENT MECONI, Secretary, Delaware Department of Health & Social Services, in his official capacity, et al., | ) ) ) ) |
| Defendants. | ) ) |

## SUPPLEMENTAL DECLARATION OF PAMELA J. TYRANSKI

I, Pamela J. Tyranski, hereby state as follows:

1.    I am Deputy Director of the Division of Medicaid and Medical Assistance.  I have held that position since July 2005.

2.    In mid-2005, Delaware's Department of Health & Social Services created a new division – the Division of Medicaid and Medical Assistance ("DMMA") – to consolidate medical assistance services and administration.  As of July 1, 2005, DMMA has had responsibility for administering Delaware's Medicaid program.

3.    I am responsible for the management and oversight of the Medicaid Long Term Care units in DMMA.

4.    I have read Plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Answering Brief") and the Supplemental Affidavit of Sean Duffy ("Suppl. Duffy Aff.") that accompanied Plaintiff's Answering Brief.  I see that plaintiff and Mr. Duffy are asserting that Ms. Duffy cannot relocate to a Delaware facility because, "in

their experience," a residential facility will not permit a prospective resident to move in unless there is a source of funding available. See Plaintiff's Answering Brief at 4; Suppl. Duffy Aff. ¶¶ 4-6. The Answering Brief states:

> In order to relocate from North Carolina, Ms. Duffy requires that her eligibility for Delaware Medicaid benefits be determined in advance of her arrival, so that she can secure a residential place-ment and access medically necessary services on the day of her arrival. Yet, Delaware requires her first to physically relocate prior to determining her eligibility for Medicaid benefits.

>                *        *        *

> In order for Marianne to move, the Duffys must both find an appropriate placement and obtain necessary funding for that placement. (Supplemental Affidavit of Sean Duffy, ¶ 3, . . .). Because the Duffys are aware of the significant expense associated with residential placements, they focused their initial efforts on seeking Delaware Medicaid eligibility for Marianne. Id. Their separate but parallel search for an appropriate placement has con-firmed that once a potential appropriate residential placement is located for Marianne, she will be unable to access it by physically relocating until her eligibility for Delaware Medicaid funding has been secured. Id. at ¶ 4.

>                *        *        *

> The Duffys are continuing their search for an appropriate place-ment for Marianne. Id. at ¶ 8. They also must continue to pursue the concurrent track of obtaining Medicaid funding for such a placement. Id. This is because, in their experience, funding must be in place prior to a final commitment for services from an ICF/MR. Id. at ¶ 6. Moreover, there is no reason to expect that a facility would provide services for free, and given the high cost of these services, no reason to expect that Marianne could move into a facility without making payment arrangements before she moves in. Id.

Plaintiff's Answering Brief at 1, 3, 4.

     5.    Plaintiff's Answering Brief also points out that, under the Medicaid regulations, the State has 90 days following a Medicaid application to determine an applicant's eligibility for Medicaid. See Plaintiff's Answering Brief at 7. That mandated maximum period of time,

however, is nowhere near the norm in Delaware and, in plaintiff's case – because we already

have so much information about Ms. Duffy, through her parents' communications with Dela-

ware's Division of Developmental Disabilities Services ("DDDS") – I am confident that, when

Ms. Duffy's parents inform us that their daughter has moved into a facility in Delaware, her

Medicaid application can and will be processed and (based on everything we know about Ms.

Duffy's circumstances) approved within about two business days of DDDS's and DMMA's

being notified that Ms. Duffy has arrived at a facility in Delaware.

      6.     Plaintiff is correct that, because of the federal and Delaware residency rules, we

cannot approve her Medicaid application until she has become a resident in Delaware.  But

plaintiff is not correct that this creates an insurmountable Catch-22 that prevents her from

moving to Delaware.  As explained below, plaintiff's parents can rather easily deal with the

residency requirement.  In my experience, when a long-term care residential facility is con-

sidering accepting a resident who is coming from out-of-state, and the prospective resident is

likely to be Medicaid-eligible, the issue of satisfying the facility's requirement of demonstrating

a payment source is readily addressed with a minimum of difficulty.  I know of no reason why

the Duffys could not do the same by coordinating their effort to find an appropriate residential

placement for their daughter with the facilities being considered and with DDDS and DMMA.

### There Is No "Catch-22"

      7.     In my initial declaration in support of Defendants' Motion for Summary Judgment,

which I signed on May 12, 2006, I explained that the circumstances of plaintiff Marianne Duffy,

as described in her First Amended Complaint, do not create the "Catch-22" that plaintiff's First

Amended Complaint asserts she faces. I stated:

> If Ms. Duffy's parents find an appropriate residential placement
> facility for her in Delaware, and that facility accepts Ms. Duffy,
> she would become a Delaware resident – and immediately eligible
> for benefits under the Delaware Medicaid program – as soon as she
> moved into the residential facility in Delaware. There is no
> "Catch-22." For their daughter to become eligible for Delaware
> Medicaid, plaintiff's parents need only find an appropriate facility
> in Delaware that accepts her for residential placement.

Declaration of Pamela J. Tyranski ("Initial Decl.") ¶ 7.

8.    In particular, I explained that, because Ms. Duffy's parents live in Delaware, two

separate federal regulations – 42 C.F.R. 435.403(i)(2)(ii) and 42 C.F.R. 435.403(i)(2)(iii) –

would each make Ms. Duffy a Delaware resident (eligible for Delaware Medicaid) if she applied

to, was accepted by, and moved into a facility in Delaware. See Initial Decl. ¶ 11. Subsection

(i)(2)(ii) would make her a Delaware resident because Delaware would be her "parent's or legal

guardian's State of residence at the time of placement" in the Delaware facility. Subsection

(i)(2)(iii) would also make her a Delaware resident because Delaware would be "[t]he current

State of residence of the parent or legal guardian who files the [Medicaid] application if [Ms.

Duffy was] institutionalized in that State[.]" Id.

9.    I further explained that, although Delaware's Medicaid regulations on the deter-

mination of residency are not identical to the federal Medicaid regulations on residency, the

differences between the two sets of Medicaid residency regulations are not material in this case

because (a) Delaware is required by federal law to follow the federal regulations; (b) in its State

Medicaid Plan, Delaware has agreed to follow the federal regulations; and (c) even under the

Delaware Medicaid residency regulation, 16 Del. Adm. Code, § 14110.7, Ms. Duffy would

become a Delaware resident if she was accepted at and moved into a Delaware facility because

her parents live in Delaware and Delaware would be "the parent's or legal guardian's State of residence at the time of placement" in the Delaware facility. See Initial Decl. ¶¶ 12-16.

10.   Furthermore, Ms. Duffy's State of residency would immediately become Delaware if she moved directly from a North Carolina ICF/MR into a Delaware facility because both the federal and Delaware Medicaid regulations prohibit a State from denying Medicaid eligibility to an individual in an institution on the ground that the individual did not establish residence in the State before entering the institution. See Initial Decl. ¶ 22.

11.   It is important to understand that, because Ms. Duffy's Delaware residency (and Medicaid eligibility) would begin immediately upon her moving into a Delaware residential facility, DMMA's determination of her Medicaid eligibility would be retroactive to the date she moved into the facility (and became a Delaware resident) – even if DMMA did not actually approve her Medicaid application for a day or so after her arrival.  In fact, as long as the Medicaid application is submitted within 90 days of Ms. Duffy's arrival at a Delaware facility (or any other person's arrival from out-of-state at a Delaware facility), and all other eligibility requirements are met, the Medicaid approval will be retroactive to the date of arrival.

**Ms. Duffy's Parents Can Begin (and Already Have Begun)
Compiling the Information Needed for a Delaware
Medicaid Application While Their Daughter Is Still In North Carolina**

12.   It is correct that DMMA would not determine the Medicaid coverage of an individual moving to Delaware from out-of-state until that person became a Delaware resident, but it is not correct that the process of preparing and submitting the necessary paperwork cannot begin before the person arrives in Delaware.

13.    Because of the Duffys' application for DDDS services and other communication with DDDS, and the previous assignment of a DDDS case manager, we already have a great deal of information about Ms. Duffy.  As I understand it, other than her not being a Delaware resident at this point, Ms. Duffy satisfies all the criteria for Delaware Medicaid eligibility.

14.    According to the First Amended Complaint, at ¶ 25, Ms. Duffy currently receives Medicaid benefits in North Carolina.  The Affidavit of Sean Duffy that plaintiff submitted with Plaintiff's Motion for Summary Judgment states, at 11, that Ms. Duffy receives Supplemental Security ("SSI") income of approximately $30.00 per month.  Mr. Duffy's affidavit states:

> Marianne's income is limited to approximately $30.00 per month in Supplemental Security Income (SSI) benefits and negligible income (approximately $113 total in 2004) for piecework in her vocational day program.  She has minimal savings (currently approximately $600 in a savings account), which is used for incidentals, such as clothing, field trips, eating out, hairdressing appointments, etc.

Affidavit of Sean Duffy ¶ 11.

15.    SSI benefits are income under a federal program, and persons who are eligible for SSI payments and do not have any significant income from other sources, generally automatically meet the financial eligibility requirements for Medicaid.  Thus, based on what her father's affidavit states, I would expect that Ms. Duffy is financially eligible for Delaware Medicaid.

16.    There is nothing to prevent the Duffys from communicating with DDDS and DMMA during their search for an appropriate residential facility in Delaware for their daughter.  Once they find an appropriate facility that is prepared to accept their daughter as a resident, the Duffys can complete and submit a Medicaid application on behalf of Ms. Duffy – again while their daughter is still in North Carolina.

**A Delaware Facility's Requirement of Providing a Source of Payment
Before Finally Accepting Ms. Duffy Can Be Easily Satisfied by the Duffys
Agreeing to be Responsible for Paying for Ms. Duffy's First Few Days in the Facility**

17.    Plaintiff's Answering Brief is undoubtedly correct in saying, at 4, that "there is no reason to expect that a facility would provide services for free[.]"  It is also certainly correct that facilities have pre-acceptance requirements that a prospective resident (or his or her family) demonstrate a source of payment.  See Plaintiff's Answering Brief 4; Suppl. Duffy Aff. ¶¶ 4-6.

18.    However, Ms. Duffy is not the first prospective resident in a Delaware long-term care facility that has sought a residential placement from out-of-state.  I am aware of many situations where individuals applying for admission to Delaware nursing homes from other states have agreed to be responsible for payment of the first day of residence in the nursing home, so the nursing home has the payment source it needs until the person's Medicaid application is processed and approved a day later and Medicaid takes over.  In those situations, because the Medicaid approval is retroactive to the date the person actually moved into the nursing home, the nursing home typically either refunds the first day's payment or sometimes never deposits the check that it received for the first day of care and returns it to the new resident or his or her family.  What actual procedure a particular residential facility would follow would, of course, depend on the facility.

19.    In the Duffys' case, Mr. and Mrs. Duffy can be confident that, if they find a residential facility in Delaware that is prepared to accept their daughter as a resident, and if they communicate with DDDS and DMMA about their plans and coordinate their daughter's move with the submission of a Medicaid application, Ms. Duffy's Medicaid application, if up-to-date and complete, will be processed and approved within about two business days of DDDS's and DMMA's being notified of her arrival at the Delaware facility.  Any requirement that a facility

has that the Duffys demonstrate a source of payment before the facility will accept Ms. Duffy as

a resident can be met by undertaking responsibility for paying (or actually paying) for the first

few days of her stay in the facility until the Medicaid application is processed and approved.

This ought not to be a significant burden because the Medicaid approval will be retroactive to the

day she moves into the Delaware facility.

I declare, under penalty of perjury, that the foregoing statement is true and correct.

Executed on ~~June~~ July 6, 2006.

Pamela J. Tyranski