IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARIANNE DUFFY, by her parents and legal guardians, SEAN and ELISE DUFFY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) )  No. 05-CV-127-GMS |
| VINCENT MECONI, Secretary, Delaware Department of Health & Social Services, in his official capacity, et al. | ) ) ) ) ) |
| Defendants. | ) |

**DEFENDANTS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Pursuant to ¶ 2(j) of the Court's form of Final Pretrial Order, the defendants submit the following proposed Findings of Fact and Conclusions of Law:

**Defendants' Proposed Findings of Fact**

1. There are alternatives in Delaware to residential placement through DDDS. The Mary Campbell Center in Wilmington, Delaware, is a private ICF/MR. In addition, there are residential service providers who contract with the State to provide residential services under the Medicaid HCB waiver but who are not barred from separately contracting with families who need and desire residential services.

2. Plaintiff's parents did not begin contacting or applying to residential facilities in Delaware until July 2005 – several months after they filed the Complaint in this lawsuit.

3. There is no evidence that the Duffys' efforts to find an appropriate residential facility for their daughter have been in any way blocked or hindered because plaintiff is currently residing in a North Carolina ICF/MR.

4. If a particular facility is unable or unwilling to accept Ms. Duffy, or if the Duffys themselves conclude that a facility will not meet their daughter's needs, then it is those factors – and not her status as a North Carolina resident under the Medicaid residency rules – that would prevent her from moving to the Delaware facility.

5. Neither the federal Medicaid regulations nor Delaware's Medicaid regulations "trap" plaintiff's residency in North Carolina. If she applied to, was accepted at, and moved into a Delaware facility, she would become a Delaware resident.

6. If plaintiff was accepted at a Delaware residential facility, and was financially eligible for Medicaid, Delaware Medicaid would not treat her any differently – in terms of what expenses Medicaid covers – than someone who was already a Delaware resident before moving into the Delaware facility. Plaintiff would not be penalized – in terms of Medicaid coverage – because she moved to the Delaware facility from out-of-state.

7. Plaintiff is not the first prospective resident in a Delaware long-term care facility who has sought a residential placement from out-of-state.

8. There is nothing to prevent the Duffys from communicating with Delaware's DDDS and Delaware's Division of Medicaid and Medical Assistance ("DMMA") during their search for an appropriate residential facility in Delaware for their daughter. Once they find an appropriate facility that is prepared to accept their daughter as a resident, the Duffys can complete and submit a Medicaid application on behalf of Ms. Duffy – while their daughter is still in North Carolina.

9. In plaintiff's case, because of the Duffys' application for DDDS services and other communication with DDDS, and the previous assignment of a DDDS case manager, Delaware already has a great deal of information about Ms. Duffy. As a result, if the Duffys find a resi-

dential facility in Delaware that is prepared to accept their daughter as a resident, and if they communicate with DDDS and DMMA about their plans and coordinate their daughter's move with the submission of a Medicaid application, plaintiff's Medicaid application, if up-to-date and complete, will be processed and approved within about two business days of DDDS's and DMMA's being notified of her arrival at the Delaware facility.

10. To the extent a particular Delaware residential facility requires some demonstration of a source of payment before admitting a prospective resident from out-of-state who is likely to be (but not yet determined to be) eligible for Delaware Medicaid, such requirement can generally be satisfied by the prospective resident (or his or her parents or guardians) agreeing to be responsible for the cost of the first few days in the facility – while the Medicaid application is being processed.

11. There have been many situations where individuals applying for admission to Delaware nursing homes from other states have agreed to be responsible for payment of the first day of residence in the nursing home, so the nursing home has the payment source it needs until the person's Medicaid application is processed and approved a day later and Medicaid takes over. In those situations, because the Medicaid approval is retroactive to the date the person actually moved into the nursing home, the nursing home typically either refunds the first day's payment or sometimes never deposits the check that it received for the first day of care and returns it to the new resident or his or her family.

12. The DDDS Registry is the system by which DDDS maintains risk-assessment and demographic data that is used to prioritize the residential service needs of individuals who are eligible or potentially eligible for services from the DDDS.

13. The Registry is not a "waiting list." It is a tool that is used by the DDDS for the primary purpose of determining the criticality of actual or potential placement needs of the individuals entered. A secondary benefit of the Registry is that it also provides information about the non-residential needs of individuals, which facilitates Family Support Services planning for individuals who are not in the Stockley Center or a community-based residential placement. At the time a person with a developmental disability is determined to be eligible for DDDS services, DDDS obtains a great deal of information about that person and his or her caregivers or family, and DDDS conducts a comprehensive risk assessment to evaluate the degree to which the person's current life circumstances might precipitate a need for residential placement.

14. The risk assessment is performed when a case manager first visits the individual and his/her family. The case manager is responsible for updating the information in the Registry whenever a change occurs in the person's (or the caregiver's) circumstances that affects the individual's need for placement.

15. The risk assessment includes an evaluation of (a) the individual's health status, (b) the caregiver's health status, (c) the composition of the person's household, (d) the environmental conditions in the household, and (e) the economic conditions in the household. Based on the assessment of these factors, each individual is assigned a priority ranking level of the projected time frame which the risk assessment suggests for needing residential placement. The priority levels are:

> **Emergency:** Individuals (and/or caregivers) who are at risk for abuse or neglect, whose caregiver is deceased, or who are homeless. Individuals in this category may be considered "emergencies."

**High Risk:** Individuals for whom the risk assessment suggests that the projected time frame for needing residential placement is 0 to 3 months.

**Moderate Risk:** Individuals for whom the risk assessment suggests that the projected time frame for needing residential placement is 3 to 12 months.

**Low Risk:** Individuals for whom the risk assessment suggests that the projected time frame for needing residential placement is more than 12 months.

16. Those individuals identified as "Emergency" are given first consideration for residential placement. When all placement needs for those in the "Emergency" category have been met, consideration for residential placement is given to those in other priority categories according to the needs of the individual and the availability of resources.

17. Although Ms. Duffy was not eligible for DDDS services because she was not (and is not) a resident of Delaware, DDDS nevertheless did an informal evaluation of the risk assessment factors described above and communicated the results of that evaluation to the Duffys. Largely because she appears to be living in a safe and supportive group home in North Carolina, the informal evaluation suggested that she would not be placed in the "Emergency" (then referred to as the "Urgent") category. She would therefore not be eligible for residential placement by DDDS – even if she were considered to be a Delaware resident.

**Defendants' Proposed Conclusions of Law**

1. The state defendants have no affirmative obligation to provide plaintiff with a residential placement in Delaware. The federal Medicaid statute requires participating states to provide "medical assistance" – which is specifically defined in 42 U.S.C. § 1396d(a) as "payment" for covered services (such as ICF/MR services). A state's obligation to provide

"medical assistance" under the Medicaid statute is thus an obligation to provide payment for covered services – not an obligation to provide the actual services themselves.

 2. The state defendants' application of the Medicaid residency rules to plaintiff in no way impinges upon plaintiff Marianne Duffy and her parents' ability to seek and, if accepted by the facility, move Ms. Duffy into an appropriate residential facility in Delaware.

 3. Under the governing federal Medicaid regulations on residency – specifically 42 C.F.R. § 435.403(i)(2)(ii) and § 435.403(i)(2)(iii) – plaintiff would immediately become a Delaware resident, eligible for Delaware Medicaid (and DDDS services) if she applied to, was accepted at, and moved into an appropriate residential facility in Delaware.

 4. Assuming plaintiffs' parents continue to be residents of the State of Delaware, plaintiff would become a Delaware resident under § 435.403(i)(2)(ii) upon moving into a residential facility in Delaware because her parents' State of residence "at the time of placement" would be Delaware.

 5. Again assuming plaintiffs' parents continue to be residents of Delaware, plaintiff would become a Delaware resident under § 435.403(i)(2)(iii) upon moving into a residential facility in Delaware because the "current State of residence" of her parents would be Delaware.

 6. Likewise, under Delaware's regulations on residency for Delaware Medicaid purposes – specifically 16 Del. Adm. Code § 14110.7a – and again assuming that plaintiff's parents continue to be residents of Delaware, plaintiff would become a Delaware resident upon moving into a residential facility in Delaware because her parents' State of residence "at the time of placement" would be Delaware.

 7. The Medicaid regulations do not prevent plaintiff from applying to and, if accepted, moving into an appropriate residential facility in Delaware. As required by law, plaintiff's status

as a Delaware resident (eligible for Delaware Medicaid) would begin immediately upon her placement in a Delaware facility – because her parents are Delaware residents.

8.   The state defendants' application of the federal Medicaid residency rules (and Delaware's own Medicaid residency regulations) are not in any way impinging upon or penalizing plaintiff's ability to exercise her constitutional right to travel.

                              Respectfully submitted,

Dated: September 11, 2006          /s/ Richard G. Placey
                                    Richard G. Placey
                                    (DE Bar I.D. No. 4206)
                                    Richard M. Donaldson
                                    (DE Bar I.D. No. 4367)
                                    MONTGOMERY, MCCRACKEN,
                                       WALKER & RHOADS, LLP
                                    300 Delaware Avenue, Suite 750
                                    Wilmington, DE 19801
                                    (302) 504-7800

                                    Patrick T. Ryan
                                    Jessica C. Goebeler
                                    MONTGOMERY, MCCRACKEN,
                                       WALKER & RHOADS, LLP
                                    123 South Broad Street
                                    Philadelphia, PA 19109
                                    (215) 772-1500

                                    A. Ann Woolfolk
                                    (DE Bar I.D. No. 2642)
                                    Deputy Attorney General
                                    State of Delaware – Department of Justice
                                    Carvel State Office Building
                                    820 N. French Street, 6th Floor
                                    Wilmington, DE  19801
                                    (302) 577-8400

                                    Counsel for Defendants