## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARIANNE DUFFY, by her parents and            )
legal guardians, Sean and Elise Duffy,        )
                                              )
            Plaintiff,                        )
                                              )        NO.  1:05-cv-127 GMS
        v.                                    )
                                              )
VINCENT MECONI, Secretary, Delaware           )
Department of Health & Social Services,       )
in his official capacity,                     )
                                              )
MARIANNE SMITH, Director, Division of         )
Developmental Disabilities Services,          )
in her official capacity,                     )
                                              )
ELAINE ARCHANGELO, Director, Division         )
of Social Services, in her official capacity, and )
                                              )
HARRY HILL, Director, Division of Medicaid    )
and Medical Assistance,                       )
                          Defendants.         )
_____)

## <u>FINAL PRETRIAL ORDER</u>

This matter having come before the court at a pretrial conference held pursuant to

Fed. R. Civ. P. ("Rule") 16, and MaryBeth Musumeci and Daniel Atkins, Disabilities

Law Program, Community Legal Aid Society, Inc., 100 West 10th Street, Suite 801,

Wilmington, DE 19801, (302) 575-0660, ext. 228 or 229, and Sarah Somers, Esq.,

National Health Law Program, 211 North Columbia Street, Chapel Hill, NC 27516, (919)

968-6771, having appeared as counsel for plaintiff, and Patrick T. Ryan and Jessica C.

Goebeler, Montgomery, McCracken, Walker & Rhoads, LLP, 123 South Broad Street,

Philadelphia, PA 19109, (215) 772-1500, and Richard M. Donaldson and Noel C.

Burnham, Montgomery, McCracken, Walker & Rhoads, LLP, 300 Delaware Avenue,

Suite 750, Wilmington, DE 19801, (302) 504-7800, having appeared as counsel for defendants, the following actions were taken:

(1)    This is an action for declaratory and injunctive relief arising from defendants' alleged violation of plaintiff's constitutional right to travel, and the jurisdiction of the court is involved under 28 U.S.C. § 1331, 28 U.S.C. §§ 1343(a)(3) and (4), and 42 U.S.C. § 1983 (2003).  Jurisdiction is not disputed.[1]

(2)    The following stipulations and statements were submitted and are attached to and made a part of this Order.

(a) a comprehensive stipulation or statement of all uncontested facts, which will become a part of the evidentiary record in the case (and which, in a jury trial, may be read to the jury by the court or any party[2]);

(b) an agreed statement or statements by each party of the contested issues of fact and law and a statement or statements of contested issues of fact or law not agreed to;

(c) except for rebuttal exhibits, schedules in the form set out in the attached Schedule (c) of:

---

[1]    In diversity cases or other cases requiring a jurisdictional amount in controversy, the Order shall contain either a stipulation that $75,000 is involved or a brief written statement citing evidence supporting the claim that such sum could reasonably be awarded.

[2]    Counsel for plaintiff has the responsibility to prepare the initial draft of a proposed stipulation dealing with allegations in the complaint.  Counsel for any counter-, cross- or third-party complainant has the same responsibility to prepare a stipulation dealing with allegations in that party's complaints.  If the admissibility of any uncontested fact is challenged, the party objecting and the grounds for the objection must be stated.

(1)  all exhibits (all exhibits shall be marked for identification before trial),

including documents, summaries, charts and other items expected to be

offered in evidence and

(2)  any demonstrative evidence and experiments to be offered during

trial[3];

(d) a list or lists of names and addresses of the potential witnesses to be called

by each party, with a statement of any objections to calling, or to the

qualifications of, any witness identified on the list[4];

(e)  stipulations or statements setting forth the qualifications of each expert

witness in such form that the statement can be read to the jury at the time the

expert witness takes the stand[5];

---

[3]        Items not listed will not be admitted unless good cause is shown.  Cumulative documents, particularly x-rays and photos, shall be omitted.  Duplicate exhibits shall not be scheduled by different parties, but may be offered as joint exhibits.  All parties shall stipulate to the authenticity of exhibits whenever possible, and this Order shall identify any exhibits whose authenticity has not been stipulated to and specific reasons for the party's failure so to stipulate.  As the attached Schedule (c) indicates, non-objected-to exhibits are received in evidence by operation of this Order, without any need for further foundation testimony.  Copies of exhibits shall be made available to opposing counsel and a bench book of exhibits shall be prepared and delivered to the court at the start of the trial unless excused by the court.  If the trial is a jury trial and counsel desires to display exhibits to the members of the jury, sufficient copies of such exhibits must be made available so as to provide each juror with a copy, or alternatively, enlarged photographic copies or projected copies should be used.

[4]        Each party shall indicate which witnesses *will* be called in the absence of reasonable notice to opposing counsel to the contrary, and which *may* be called as a possibility only.  Any witness not listed will be precluded from testifying absent good cause shown, except that each party reserves the right to call such rebuttal witnesses (who are not presently identifiable) as may be necessary, without prior notice to the opposing party.

(f)  a list of all depositions, or portions thereof, to be read into evidence and statements of any objections thereto[6];

(g)  an itemized statement of special damages;

(h)  waivers of any claims or defenses that have been abandoned by any party;

(i)  for a jury trial, each party shall provide the following:

(i) trial briefs except as otherwise ordered by the court[7];

---

[5]     Only one expert witness on each subject for each party will be permitted to testify absent good cause shown.  If more than one expert witness is listed, the subject matter of each expert's testimony shall be specified.

[6]     If any party objects to the admissibility of any portion, both the name of the party objecting and the grounds shall be stated.  Additionally, the parties shall be prepared to present to the court, at such time as directed to do so, a copy of all relevant portions of the deposition transcript to assist the court in ruling *in limine* on the objection.  All irrelevant and redundant material including all colloquy between counsel shall be eliminated when the deposition is read at trial.  If a video deposition is proposed to be used, opposing counsel must be so advised sufficiently before trial to permit any objections to be made and ruled on by the court and to allow objectionable material to be edited out of the film before trial.  If good cause is shown as to why objections to portions of a video tape deposition could not be made sufficiently before trial to permit the court to rule, objections shall be handled by a procedure prescribed by the court in accordance with D.Del. LR 30.4(e).  Video tape depositions shall otherwise be handled at trial in accordance with D.Del. LR 30.4(d).

[7]     No party's trial brief shall exceed 15 pages without prior approval of the court.  Trial briefs are intended to provide full and complete disclosure of the parties' respective theories of the case.  Accordingly, each trial brief shall include statements of:
(a)  the nature of the case,
(b)  the contested facts the party expects the evidence will establish,
(c)  the party's theory of liability or defense based on those facts and the uncontested facts,
(d)  the party's theory of damages or other relief in the event liability is established, and
(e)  the party's theory of any anticipated motion for directed verdict.
The brief shall also include citations of authorities in support of each theory stated in the brief.  Any theory of liability or defense that is not expressed in a party's trial brief will be deemed waived.

(ii) three sets of marked proposed jury instructions, verdict forms, and special interrogatories, if any[8]; and

(iii) a list of the questions the party requests the court to ask prospective jurors in accordance with Fed.R.Civ.P. 47(a) and D.Del.LR 47.1(a)[9];

(j) for a non-jury trial, each party shall provide proposed *Findings of Fact and Conclusions of Law* in duplicate[10];

(k) a statement summarizing the history and status of settlement negotiations, indicating whether further negotiations are ongoing and likely to be productive;

---

[8]     When this Order is filed, it shall be the responsibility of counsel for the plaintiff to file with the Clerk, in triplicate <u>and</u> on diskette, joint instructions <u>with</u> objections (i.e., the parties shall submit three separate, stapled copies of a single set of proposed jury instructions which shall include either side's objections to any given instruction along with their proposed instruction directly on the page following the instruction to which there is an objection). Prior to this submission, counsel must confer and make every reasonable effort to resolve objections and to submit agreed upon proposed jury instructions. Each proposed jury instruction shall carry a descriptive title. Each instruction shall be numbered in such a way as to identify which party is the proponent or whether it has been submitted jointly. All instructions, including objections, shall be in writing and include citations of supporting authorities. Failure to object may constitute waiver of any objection.

        At the time of trial, counsel for the plaintiff shall submit an unmarked original set of instructions, verdict sheet, and any special interrogatories to the court in triplicate; to be sent to the jury room after being read to the jury. Supplemental requests for instructions during the course of the trial or at the conclusion of the evidence will be granted solely as to those matters that cannot be reasonably anticipated at the time of presentation of the initial set of instructions.

[9]     Special voir dire questions shall be filed in triplicate and on diskette along with this Order but shall otherwise be filed in accordance with D.Del. LR 47.1(a).

[10]    These shall be separately stated in separately numbered paragraphs. Findings of Fact Should contain a detailed listing of the relevant material facts the party intends to prove. They should not be in formal language, but should be in simple narrative form. Conclusions of Law should contain concise statements of the meaning or intent of the legal theories set forth by counsel.

(l)  a statement that each party has completed discovery, including the depositions of expert witnesses (unless the court has previously ordered otherwise).  Absent good cause shown, no further discovery shall be permitted[11]; and

(m)  motions *in limine*:  **No party shall file more than ten (10) motions in limine without prior approval of the court.  Briefs (opening, answering, and reply) on all such motions shall be due at the time of the filing of this Pretrial Order.  Opening and answering briefs shall not exceed five (5) pages and reply briefs shall not exceed three (3) pages.  The parties should submit an original and two (2) copies.**

(3)     Trial of this case is expected to take three days, October 23-25, 2006.

(4)     Jury               Non-jury **X**

(5)     The parties recommend that no jurors be selected at the commencement of the trial.

(6)     This Order will control the course of the trial and may not be amended except by consent of the parties and the court, or by order of the court to prevent manifest injustice.

(7)     Possibility of settlement of this case was considered by the parties.

---

[11]     If this is a case in which (contrary to the normal requirements) discovery has not been completed, this Order shall state what discovery remains to be completed by each party.

_____
UNITED STATES DISTRICT JUDGE

Date: October 3, 2006


_/s/ MaryBeth Musumeci_____          /s/ Richard M. Donaldson_____
MaryBeth Musumeci (#4128)                        Noel C. Burnham (#3483)
Daniel Atkins (#2970)                            Richard M. Donaldson (#4367)
Disabilities Law Program                         Montgomery, McCracken,
Community Legal Aid Society, Inc.                   Walker & Rhoads, LLP
100 W. 10th Street, Suite 801                     300 Delaware Avenue, Suite 750
Wilmington, DE 19801                             Wilmington, DE 19801
(302) 575-0660, ext. 228 or 229                  (302) 504-7800
(302) 575-0840 fax                               nburnham@mmwr.com
mmusumeci@declasi.org                            rdonaldson@mmwr.com
datkins@declasi.org

Jane Perkins                                     Patrick T. Ryan
Sarah Somers                                     Jessica C. Goebeler
National Health Law Program                      Montgomery, McCracken,
211 N. Columbia Street                             Walker & Rhoads, LLP
Chapel Hill, NC 27516                            123 South Broad Street
(919) 968-6308                                   Philadelphia, PA 19109
(919) 968-8855 (fax)                             (215) 772-1500
perkins@healthlaw.org                            pryan@mmwr.com
somers@healthlaw.org                             jgoebeler@mmwr.com

Attorneys for Plaintiff                          Attorneys for Defendants

Schedule (a)

Stipulation of Uncontested Facts

The parties stipulate that the following facts are uncontested in this litigation:

1.   Plaintiff Marianne Duffy is a thirty-three year old North Carolina Medicaid beneficiary with developmental disabilities who lives in an intermediate care facility for mental retardation (ICF/MR) in North Carolina.  Her parents and legal guardians, Sean and Elise Duffy, live in Delaware, more than 400 miles away.  Ms. Duffy resided at Carobell, an ICF/MR group home in Hubert, North Carolina, from 1994 to August 2006.  On or about August 25, 2006, Ms. Duffy began residing at Caswell Center, an ICF/MR in Kinston, North Carolina.

2.   Ms. Duffy's disabilities include blindness, autism, profound mental retardation, and a seizure disorder.  She is non-verbal and requires a highly-structured living environment with constant supervision and care due to her susceptibility to seizures, falling, and self-abusive behavior.  Recent evaluations indicate that Marianne experiences significant periods of self-injurious behavior, including hitting herself with her fist, hitting herself on hard surfaces, biting her lip, and digging her fingernails into her skin.  Between May and October, 2005, she averaged more than 26 episodes of self-abusive behavior per month.   Marianne continues to require frequent supervision to prevent injury to herself.  Ms. Duffy may remain awake for periods up to twenty-four or forty-eight hours on a regular basis and will sometimes scream or laugh for hours at a time.

3.   Because of Marianne's need for constant intensive supervision, her parents cannot adequately care for her in their home without professional assistance, even for a

day.  She has lived in residential placements since she was eleven years old.  Until

approximately 1998 or 1999, Marianne would spend one night per week at her parents'

home in North Carolina.  Her parents were increasingly concerned about her safety

during those visits.  Among other dangers, her seizures cause her to fall easily.  Once,

Marianne had a seizure in the shower and her parents were afraid that she would

seriously injure herself.  Thereafter, until 2001, Marianne would stay with her family for

a period of about twenty-four hours during the Christmas holidays, when her parents and

her two adult brothers were available to take shifts monitoring her around the clock.  She

has not had an overnight visit with her parents since they moved to Delaware in 2001.

      4.  In April, 2001, Marianne's father, Sean Duffy, relocated to Delaware as a

result of a new job, and her mother, Elise Duffy, followed in 2002.  Marianne's parents

are her legal guardians, and they want her to live in Delaware so that she can live closer

to her family.  Marianne has a very close relationship with her parents.  While Mr. and

Mrs. Duffy lived in North Carolina, they would visit with Marianne once a week to go

out to lunch and bring her to their home once a week for a day visit.  They also could

(and occasionally did) drop in at the group home unannounced to check on how Marianne

was doing and monitor her care.  Now, since Marianne continues to reside in a North

Carolina ICF/MR, Mr. and Mrs. Duffy must travel to North Carolina to visit her.

Marianne is now only able to see her parents every three months.  She has no other way

to communicate with her parents because she is essentially nonverbal.

      5.  Marianne currently receives Medicaid benefits in North Carolina.  Mr. and

Mrs. Duffy have applied for services on her behalf through Delaware's Division of

Developmental Disabilities Services (DDDS).  According to DDDS, Marianne's

application for DDDS services has been placed on "inactive status" because, although Marianne was determined to meet the clinical eligibility criteria for DDDS services, she has to establish Delaware residency before she can access DDDS services and Delaware Medicaid benefits.

6. After Delaware's initial placement of Marianne's DDDS application on inactive status, Mr. and Mrs. Duffy pursued an internal DDDS appeal on Marianne's behalf. On July 3, 2003, the DDDS Director, Marianne Smith, determined that Marianne was not a state resident and was therefore not eligible for DDDS services. She also informed the Duffys that, based on an evaluation of the various factors DDDS uses to assess a Delaware resident's current and projected level of need for residential services, Marianne's circumstances would not place her in the state registry's "urgent" category – the category of individuals to whom "DDDS is obligated by policy to first provide residential services . . . before offering such to individuals in categories of lesser priority." For these reasons, the DDDS Director's letter concluded, "immediate residential services cannot be arranged for Marianne in Delaware[.]" Marianne was, however, assigned a DDDS case manager, and her parents were instructed to contact DDDS if Marianne moved to Delaware and became a state resident.

7. Marianne cannot move to Delaware until an appropriate residential facility (with appropriate services) is located that will accept her as a resident and into which she can move when she arrives. Her psychologist, Marc Goldman, has stated that "she could not live safely in a private home with untrained family members or other individuals for even a day." Defendant Meconi has acknowledged in a letter, dated February 4, 2004, that "it is readily apparent from my review of this case that Marianne cannot move to

Delaware for the purpose of establishing residency <u>unless</u> provisions are made to relocate her directly from her current placement to one that would be able to provide the requisite supports for her special needs."

      8.  Marianne's own income and resources are insufficient for her to pay for the cost of a residential placement.  For example, the Mary Campbell Center, an ICF/MR in Delaware, costs between $275.00 to $300.00 per day for private pay patients.  In 2002, Delaware estimated that the average daily cost for a resident in the Stockley Center, another Delaware ICF/MR, was approximately $373.00.  In addition, Marianne is also unable, without the assistance of Medicaid benefits, to pay for her other health care costs, such as prescription drugs, medical tests, hospitalizations, and doctors' visits.  Marianne's only regular source of income is her Supplemental Security Income (SSI) benefits and negligible income (approximately $113.00 total in 2004) for piecework in her vocational day program.  She has minimal savings and no other resources.  (The total SSI grant is approximately $600.00 per month.  Currently, all but a personal needs allowance of $30.00 of Marianne's grant is being paid to her ICF/MR for her care.)  Plaintiff is thus unable to pay for the cost of a residential placement and other medically necessary services in the absence of Medicaid benefits.

      9.  The Duffys expected that locating an appropriate residential placement for Marianne would not be easy as a result of her significant disabilities and needs.  The Duffys have moved interstate with Marianne before – from Pennsylvania to North Carolina.  When they first moved to Delaware, the Duffys expected that they would be able to accomplish another move for Marianne.

10.   In July 2005, the Duffys formally began to explore potential group home and other placements that accept Delaware Medicaid.  The Duffys have contacted the Mary Campbell Center, Community Systems, Inc. (CSI), Bancroft, and Chimes in Delaware. CSI never returned the Duffys' telephone call.  After discussing Marianne's needs with Bancroft staff, the Duffys were advised that Bancroft residents functioned at a higher level than Marianne.  The Duffys did apply for services at Chimes; however, Chimes staff determined that they were unable to meet Marianne's needs, and instead recommended that the Duffys explore Chesapeake Care Resources, Inc. (CCRI), an ICF/MR located ten miles over the Delaware state line in North East, Maryland.  The Duffys learned that CCRI serves several Delaware residents in their residential program. CCRI recently determined, however, that it is unable to meet Marianne's needs.

11.   In November 2005, the Duffys submitted an application on Marianne's behalf to the Mary Campbell Center, an ICF/MR in Wilmington, Delaware.  The Mary Campbell Center determined, however, that it is unable to satisfy Marianne's needs.

12.   The Duffys are continuing their search for an appropriate placement for Marianne.

13.   The Duffys also have contacted Devereux at Whitlock in Pennsylvania.

14.   The Duffys also have contacted Bancroft NeuroHealth in New Jersey, which has asked to review Ms. Duffy's records, and the Princeton Child Development Institute, which does not serve adults.  The Duffys are in the process of exchanging phone messages with the Eden Institute and Arc of Washington.

15.   Once the Duffys find an appropriate facility that is prepared to accept their daughter as a resident, the Duffys can complete and submit any remaining paperwork

necessary for a Medicaid application on behalf of Ms. Duffy – while their daughter is still in North Carolina.

16.  If plaintiff applied to, was accepted at, and moved into an appropriate residential facility in Delaware, she would be a Delaware resident under the Medicaid regulations from the time she arrived at the Delaware facility.

17.  In plaintiff's case, because of the Duffys' application for DDDS services (including Delaware Medicaid benefits) and other communication with DDDS, and the previous assignment of a DDDS case manager, Delaware already has a great deal of information about Ms. Duffy.

18.  There have been many situations where individuals applying for admission to Delaware nursing homes from other states have agreed to be responsible for payment of the first day of residence in the nursing home, so the nursing home has the payment source it needs until the person's Medicaid application is processed and approved a day later and Medicaid takes over.  In those situations, because the Medicaid approval is retroactive to the date the person actually moved into the nursing home, the nursing home typically either refunds the first day's payment or sometimes never deposits the check that it received for the first day of care and returns it to the new resident or his or her family.  Objection:  Plaintiff is without sufficient information to contest the statements in this paragraph; however, plaintiff objects on the grounds that the general policies and practices of Delaware nursing homes are not relevant because this case is about ICF/MR services.

The following is a set of statements that the parties do not contest in this litiga-

tion. Plaintiff, however, believes that these statements are more properly regarded as

conclusions of law than as facts.

1. The federal Medicaid statute requires that a State participating in the Medicaid

program provide the "medical assistance" described in the statute and in the State's

Medicaid Plan to eligible residents of the State.

2. "Medical assistance" is defined in the Medicaid Act as "payment of part or all

of the cost of the following care and services." 42 U.S.C. § 1396d(a). One of the

optional services listed in the Medicaid statute is "services in an intermediate care facility

for the mentally retarded." 42 U.S.C. § 1396d(a)(xiii)(15). Delaware's Medicaid Plan

provides for "medical assistance" for eligible persons for services in an intermediate care

facility for the mentally retarded.

3. The federal Medicaid residency requirement is found in 42 C.F.R. § 435.403.

The regulations provide:

> (a) <u>Requirement</u>. The agency must provide Medicaid to
> eligible residents of the State, including residents who are
> absent from the State. . . .
>
>               \*      \*      \*
>
> (i) <u>Individuals Age 21 and over</u>. (1) For any individual not
> residing in an institution as defined in paragraph (b), the
> State of residence is the State where the individual is—
>      (i) Living with the intention to remain there perma-
> nently or for an indefinite period (or if incapable of stating
> intent, where the individual is living); . . .
>
>               \*      \*      \*
>
> (2) For any institutionalized individual who became
> incapable of indicating intent before age 21, the State of
> residence is—
>
>               \*      \*      \*

> (ii)  The parent's or legal guardian's State of residence at the time of placement . . . ; or
> (iii)  The current State of residence of the parent or legal guardian who files the application if the individual is institutionalized in that State . . . .

42 C.F.R. § 435.403.

4.  The Medicaid residency criteria that appear in the Delaware Division of Social Services Manual ("DSSM") are similar (but not identical) to the federal Medicaid residency regulations.  The residency provisions in the DSSM track the language of 42 C.F.R. § 435.403(i)(2)(ii) but do not include the additional language from 42 C.F.R. § 435.403(i)(2)(iii).  The DSSM provisions state:

**14110.7   Criteria Specific To Individuals Age 21 And Over**

a.  For any institutionalized individual who became incapable of indicating intent before age 21, the State of residence is:  the parent's or legal guardian's State of residence at the time of placement or if a legal guardian is appointed and parental rights are terminated, the State of residence of the guardian is used.

b.  For any institutionalized individual who became incapable of indicating intent at or after 21, (irrespective of any type of guardianship) the State of residence is the State in which the individual is physically present, except where another State makes a placement.

c.  For any non-institutionalized individual incapable of indicating intent at or after age 21, the State of residence is where the individual is living.

16 Del. Adm. Code § 14110.7.

5.  In addition to providing "medical assistance" under its Medicaid program to eligible persons for ICF/MR services, Delaware provides residential services to eligible

Delaware residents with developmental disabilities under a federally-approved home and community-based waiver of certain Medicaid requirements ("HCB Medicaid Waiver").

6.   The federal-government-approved eligibility criteria Delaware's HCB Medicaid Waiver program uses for residential placement through DDDS residential services are as follows:

> An individual shall be eligible for the DDDS Home and Community-Based Services (HCBS) Waiver when they are:
>
> (1)  eligible for DDDS services;
>
> (2)  determined to need the ICF/MR level care and are financially eligible for Medicaid; and
>
> (3)  in need of residential services (as identified via the "Emergency" category of the DDDS Registry) or a resident of Stockley Center.

7.   As long as a Medicaid application is submitted within 90 days of a person's arrival at a Delaware long-term care residential facility from out-of-state, and all other eligibility requirements are satisfied, the Delaware Medicaid approval will be retroactive to the date of the person's arrival at the Delaware facility.

Schedule (b)

Statements of Contested Issues of Fact and Law

The parties agree that the following issues of fact and law are contested in this litigation. However, plaintiff does not concede that any of the following contested facts are material facts for purposes of her pending motion for summary judgment. (D.I. 54). The state defendants believe that, in the list of "Contested Issues of Fact" set out below, the issues listed as Nos. 1 and 3 are not material to the state defendants' pending motion for summary judgment (D.I. 50) and the issues listed as Nos. 2 and 4-7 cannot prevent the granting of the state defendants' pending motion for summary judgment because plaintiff has not presented any factual basis for contesting them.

Contested Issues of Fact:

1. Whether at the time the Duffys moved from Pennsylvania to North Carolina in 1993, they were able to both locate an appropriate residential placement and secure necessary Medicaid funding prior to plaintiff's arrival without any of the alleged difficulties that they are currently experiencing with plaintiff's Delaware Medicaid eligibility?

2. Whether the Duffys must obtain Delaware Medicaid funding and/or a referral from DDDS/DMMA in order to obtain a final commitment for services from an ICF/MR or other residential facility that accepts Delaware Medicaid for plaintiff?

3. Whether the Duffys have received any assistance from the state of Delaware during their search for an appropriate residential placement for plaintiff?

4. Whether there are meaningful alternatives to residential placement through Medicaid ICF/MR services or DDDS services for Delaware residents, and whether there

are residential service providers who do separately contract with families who need and desire residential services?

5.  Whether there is anything to prevent the Duffys from communicating with Delaware's DDDS and DMMA during their search for an appropriate residential facility that accepts Delaware Medicaid?

6.  If the Duffys find a residential facility that accepts Delaware Medicaid benefits that is prepared to accept plaintiff as a resident, and if the Duffys communicate with DDDS and DMMA about their plans, whether plaintiff's Medicaid application, if up-to-date and complete, will be processed and approved within about two business days of DDDS's and DMMA's being notified of plaintiff's arrival at the facility?

7.  Whether ICR/MRs and other residential facilities that accept Delaware Medicaid require some demonstration of a source of payment before admitting a prospective resident from out-of-state who is likely to be (but not yet determined to be) Medicaid-eligible, and whether such requirement can be satisfied by plaintiff or her parents agreeing to be responsible for the cost of the first few days in the facility while the Medicaid application is being processed?

Contested Issues of Law:

1.  Whether Defendants' application of the Medicaid residency regulations violates Plaintiff's fundamental right to interstate travel, as secured by the Equal Protection Clause of the Fourteenth Amendment?

2.  Whether Defendants' application of the Medicaid residency regulations to Plaintiff violates her right to interstate travel, as protected under the Privileges and Immunities Clause of the Fourteenth Amendment?

   3.  Whether Defendants' application of the Medicaid residency regulations to
Plaintiff violates her right to interstate travel, as protected under the Privileges and
Immunities Clause of Article IV of the U.S. Constitution?

Schedule (c)

Exhibits[12]

1.     The following exhibits were offered by plaintiff, received in evidence and marked

as indicated:

| Identification Number | Brief Description |
|---|---|
| P1 | Delaware Health and Social Services, Division of Mental Retardation "Your Individual Profile," completed May 1, 2001 (16 pages). |
| P2 | Delaware Dep't of Health & Social Services, Division of Mental Retardation Application for Services, dated April 12, 2001 (1 page). |
| P3 | Letter from Susan Morrison Smith to Ms. Marianne Duffy, dated April 17, 2001 (1 page). |
| P4 | Letter from Sean Duffy to Susan M. Smith, dated September 3, 2002 (2 pages). |
| P5 | Letter from Roy A. Lafontaine to Sean Duffy, dated September 30, 2002 (2 pages). |
| P6 | Letter from Sean Duffy to Roy A. Lafontaine, dated Oct. 22, 2002 (2 pages). |
| P7 | Letter from Roy Lafontaine to Sean and Elise Duffy, dated Dec. 18, 2002 (1 page). |
| P8 | Letter from Mary T. Anderson to Elise Duffy, dated June 2, 2003 (1 page). |
| P9 | Hearing Appeal Letter from Sean and Elise Duffy, dated June 11, 2003 (2 pages). |
| P10 | Letter from Marianne Smith to Mr. and Mrs. Sean Duffy, July 3, 2003 (2 pages). |

---

[12]     As in the Final Pretrial Order form, references to "plaintiff" and "defendant" are intended to cover those instances where there are more than one of either.

P11                          Letter from A. Ann Woolfolk to Roy Lafontaine, dated
                             Aug. 8, 2003 (1 page).

P12                          Letter from Vincent P. Meconi to Elise Duffy, dated Feb. 4,
                             2004 (2 pages).

P13                          Individual Habilitation Plan for Marianne Duffy, dated Feb.
                             6, 2006 (12 pages).

P14                          Psychological Report for Marianne Duffy, dated Nov. 14,
                             2005 (4 pages).

P15                          Quarterly Summary for Marianne Duffy, dated Nov. 1,
                             2005-Jan. 31, 2006 (2 pages).

P16                          Annual Health Summary for Marianne Duffy, dated Dec.
                             13, 2005 (6 pages).

P17                          Psychological Evaluation for Marianne Duffy, dated Nov.
                             30, 2004 (3 pages).

P18                          Annual Health Summary for Marianne Duffy, dated Dec.
                             15, 2004 (5 pages).

P19                          Curriculum vitae of Marc Goldman (9 pages).

2.     The following exhibits were offered by plaintiff and marked for identification.

Defendants objected to their receipt in evidence on the grounds stated[13]:

        None.  Defendants do not object to the admission of the exhibits listed above.

3.     The following exhibits were offered by defendants, received in evidence and

marked as indicated:

Identification Number        Brief Description

D1                           Page 1 (State Plan Submittal Statement) of Delaware State
                             Plan Under Title XIX of the Social Security Act [i.e., the
                             Delaware State Medicaid Plan]

---

[13]     Copies of objected-to exhibits should be delivered to the court with this Order, to
permit rulings *in limine* where possible.

| | |
|---|---|
| D2 | Delaware Division of Developmental Disabilities Services – Intake Eligibility Process (Written/Revised by DDDS Policy Committee) (Revision Date:  February 2004) |
| D3 | Delaware Division of Developmental Disabilities Services – Individual Eligibility for Home and Community Based Services (Written/Revised by DDDS Policy Committee) (Date of Current Review/Revision:  February 2004) |
| D4 | Delaware Division of Developmental Disabilities Services – DDDS Registry (Written/Revised by Valerie Smith, Chief of Administration) (Revision Date:  May 2002) |
| D5 | Division of Mental Retardation – Interdisciplinary Progress Notes re Marianne Duffy (2 pages) (D 0097-98) |

4.     The following exhibits were offered by defendants and marked for identification. Plaintiff objected to their receipt in evidence on the grounds stated[14]:

None.  Plaintiff does not object to the admission of any of the exhibits listed above.

---

[14]     See footnote 2 of this Schedule.

Schedule (d)

Potential Witnesses and Objections

<u>Witnesses to be called by Plaintiff:</u>

     Plaintiff will call as witnesses:

1.     Sean Duffy
     1301 N Harrison St., 1407
     Wilmington, DE 19806.

     Plaintiff may call as witnesses:

1.     Marc Goldman
     2310 Snowcrest Trail
     Durham, NC 27707.

2.     Debbie Sulli
     Devereux at Whitlock
     139 Leopard Road
     Berwyn, PA 19312.

3.     Jolene Paruch
     Chesapeake Care Resources, Inc.
     80 Marysville Road
     North East, MD 21901.

4.     Joanne Arena
     Mary Campbell Center
     4641 Weldin Road
     Wilmington, DE 19803.

<u>Objections:</u>

     Defendants object to the testimony of Debbie Sulli and Jolene Paruch on the

ground that these witnesses are employed at residential facilities outside Delaware.  To

the extent that plaintiff intends to offer their testimony as to policies or procedures in

place at, or followed by, residential facilities in states outside Delaware, their testimony is

not relevant to any issues raised by the claims asserted in plaintiff's First Amended

Complaint.

Witnesses to be called by Defendants:

      Defendants will call as witnesses:

1.     Roy A. Lafontaine, Ph.D.
      Deputy Director
      Division of Developmental Disabilities Services
      Woodbrook Professional Center
      1056 S. Governor's Ave., Suite 101
      Dover, DE  19904

2.     Pamela J. Tyranski
      Deputy Director
      Division of Medicaid and Medical Assistance
      Herman Holloway, Sr. Campus – Lewis Building
      New Castle, DE  19720-0906

      Defendants may call as witnesses:

1.     Marianne Smith
      Director
      Division of Developmental Disabilities Services
      Woodbrook Professional Center
      1056 S. Governor's Ave., Suite 101
      Dover, DE  19904

2.     Lisa Zimmerman
      Division of Medicaid and Medical Assistance
      Herman Holloway, Sr. Campus – Lewis Building
      New Castle, DE  19720-0906

3.     Eileen Challenger
      Family Support Specialist
      Division of Developmental Disabilities Services
      Woodbrook Professional Center
      1056 S. Governor's Ave., Suite 101
      Dover, DE  19904

4.     A representative of The Mary Campbell Center
      4641 Weldin Road
      Wilmington, DE 19803.

Schedule (e)

Expert Witness Qualifications

<u>Expert Witness for Plaintiff:</u>

<u>Marc Goldman</u> is Marianne Duffy's treating psychologist. He holds a bachelor's degree in psychology from the University of Missouri-St. Louis, and a master's degree in community/school psychology from Southern Illinois University of Edwardsville. He is licensed in North Carolina, and travels throughout the state to assess patients, prescribe treatment, formulate behavioral plans, and provide training. One of his areas of specialty is the development of support and intervention plans for individuals with developmental disabilities who have challenging behaviors. He has been in private practice since 2000. Through a contract with Carobell, Inc., he examines residents of its group home in Hubert, North Carolina on a regular basis. On November 14, 2005, he evaluated Marianne Duffy to assist Carobell staff in the development of her Individualized Habilitation Plan and a behavioral plan.

Schedule (f)

Depositions to be Read Into Evidence

No depositions were taken by any party.

Schedule (g)

Itemized Statement of Special Damages

Plaintiff does not seek special damages.

Schedule (h)

Waivers of Claims or Defenses

Plaintiff does not waive any of the claims set forth in her First Amended Complaint (D.I. 36).

Defendants do not waive any of the defenses asserted in their Answer to plaintiff's First Amended Complaint (D.I. 40).

Schedule (i)

Jury Trial Materials

Not applicable.  This will be a bench trial.

Schedule (j)

Proposed *Findings of Fact and Conclusions of Law*

The parties are submitting their proposed Findings of Fact and Conclusions of Law separately as separate filings (D.I. 67 and 68).

Schedule (k)

History and Status of Settlement Negotiations

Prior to the scheduling conference, the parties had preliminary discussions about whether there was any way to resolve the claims asserted in Plaintiff's complaint. The parties participated in teleconferences on November 28, 2005, March 29, 2006 and September 6, 2006, before Magistrate Judge Mary Pat Thynge to discuss alternative dispute resolution. A mediation session tentatively scheduled for June 13, 2006 was cancelled because the Defendants indicated their belief that the legal and policy issues raised by plaintiff's claims in this case do not lend themselves to a negotiated compromise. As of the date of the submission of this proposed Final Pretrial Order, further negotiations are not ongoing and are not likely to be productive as Defendants' position has not changed.

Schedule (l)

Completion of Discovery

Each party has completed discovery.